UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| CHRISTIAN PISUT, | ) | |
| | ) | |
| Plaintiff, | ) | 13 C 6858 |
| | ) | |
| vs. | ) | Judge Feinerman |
| | ) | |
| UNITED TRANSPORTATION UNION, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

Christian Pisut alleges that United Transportation Union ("UTU") breached its duty of fair representation under the Railway Labor Act ("RLA"), 45 U.S.C. § 151 *et seq.*, by failing to challenge his termination by Illinois Central Railroad Company pursuant to the appeal procedures set forth in the governing collective bargaining agreement ("CBA"). Doc. 22. Early in the litigation, UTU moved to dismiss the suit under Federal Rule of Civil Procedure 12(b)(6) on statute of limitations grounds, Doc. 9, and the court denied the motion, Docs. 20-21 (reported at 2014 WL 714405 (N.D. Ill. Feb. 25, 2014)). With discovery concluded and trial set for November 16, 2015, Doc. 74, UTU has moved for summary judgment, Doc. 58, and Pisut has moved for partial summary judgment as to liability, Doc. 60. Both motions are denied.

**Background**

When considering UTU's summary judgment motion, the facts are considered in the light most favorable to Pisut, and when considering Pisut's summary judgment motion, the facts are considered in the light most favorable to UTU. *See First State Bank of Monticello v. Ohio Cas. Ins. Co.*, 555 F.3d 564, 567 (7th Cir. 2009) ("[B]ecause the district court had cross-motions for summary judgment before it, we construe all facts and inferences therefrom in favor of the party

against whom the motion under consideration is made.") (internal quotation marks omitted); *see also McCleskey v. DLF Constr., Inc.*, 689 F.3d 677, 679 (7th Cir. 2012). That said, because Pisut's summary judgment motion requires minimal discussion, the following places Pisut into the role of non-movant, stating the facts as favorably to him as the record and Local Rule 56.1 allow. *See Hanners v. Trent*, 674 F.3d 683, 691 (7th Cir. 2012); *Singer v. Raemisch*, 593 F.3d 529, 533 (7th Cir. 2010). On summary judgment, the court must assume the truth of those facts, but does not vouch for them. *See Smith v. Bray*, 681 F.3d 888, 892 (7th Cir. 2012).

Before proceeding, the court notes that ¶¶ 7, 9, and 10 of UTU's Local Rule 56.1(b)(3)(B) response deny the corresponding paragraphs of Pisut's Local Rule 56.1(a)(3) statement without citing any record material to support the denials. Doc. 65-1 at ¶¶ 7, 9, 10. This violates Local Rule 56.1(b)(3)(B), which requires the non-movant to provide "a response to each numbered paragraph in the moving party's statement, including, in the case of any disagreement, specific references to the affidavits, parts of the record, and other supporting materials relied upon." N.D. Ill. L.R. 56.1(b)(3)(B). Accordingly, ¶¶ 7, 9, and 10 of Pisut's Local Rule 56.1(a)(3) statement are deemed admitted. *See Keeton v. Morningstar, Inc.*, 667 F.3d 877, 880 (7th Cir. 2012); *Parra v. Neal*, 614 F.3d 635, 636 (7th Cir. 2010); *Cracco v. Vitran Express, Inc.*, 559 F.3d 625, 632 (7th Cir. 2009); *FTC v. Bay Area Bus. Council, Inc.*, 423 F.3d 627, 634 (7th Cir. 2005); *Smith v. Lamz*, 321 F.3d 680, 682-83 (7th Cir. 2003); *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 922 (7th Cir. 1994).

On April 14, 2010, while employed as a trainman by Illinois Central Railroad, Pisut was involved in an incident with two other crew members. Doc. 72 at ¶ 20. Pisut had several prior disciplinary incidents; in some, he was at fault, while in others, he accepted responsibility for his fellow employees' misconduct so they could avoid discipline. *Id*. at ¶¶ 12-19. On April 20,

2010, Illinois Central notified Pisut that it was investigating the April 14, 2010 incident and that Pisut could "arrange for representation as provided under the applicable provisions of the Collective Bargaining Agreement." *Id*. at ¶ 20.

At all relevant times, Pisut was a member of UTU, the union that served as his exclusive bargaining representative pursuant to a CBA between UTU and Illinois Central. *Id*. at ¶¶ 2-3, 8. Illinois Central did not copy UTU on its notice that it was investigating the April 2010 incident, and Pisut did not forward the notice to his UTU local chairperson, Dale DeKeyser. *Id*. at ¶ 20. (UTU has a three-level hierarchy: (1) International, the union's administrative head; (2) General Committees of Adjustment, which are mid-level bodies responsible for negotiating and policing the CBA; and (3) locals, where membership is held. *Id*. at ¶ 4.) Pisut instead contacted Bill Hardlannert, who recently had resigned as the local chairperson. *Id*. at ¶ 20. In May 2010, Hardlannert received DeKeyser's "blessing" to handle cases still outstanding from his time as local chairperson, *ibid*., which had ended in March 2010, *id*. at ¶ 7. Although Pisut's April 2010 incident occurred after Hardlannert's resignation, Pisut indicated that he felt more comfortable with Hardlannert as his representative. *Id*. at ¶ 21. In addition, Hardlannert was already representing Pisut in an Illinois Central investigation of an earlier incident. *Ibid*.

On July 20, 2010, Illinois Central conducted a formal investigation into the April 2010 incident. *Id*. at ¶ 23. Pisut participated in the investigation. *Ibid*. In early August 2010, Illinois Central notified Pisut that it was terminating him as a result of the incident. *Id*. at ¶¶ 24-25. Illinois Central copied Hardlannert but not DeKeyser on the correspondence. *Id*. at ¶ 25. Although Pisut's Local Rule 56.1(b)(3)(B) response to UTU's Local Rule 56(a)(3) statement does not indicate the precise date of the termination, *ibid*., he elsewhere places the date as August 3, 2010, Doc. 60-1 at 1.

Article 28, Section 1A of the CBA states that "[t]he United Transportation Union shall have the exclusive right to represent all Trainmen in company level grievance, claim and disciplinary proceedings on those Companies on which the UTU is the lawfully recognized or certified collective bargaining representative for that craft." Doc. 58-4 at 4. Article 28, Section 2 adds that "[a]ll claims or grievances must be presented in writing by the Trainman involved, or on behalf of the Trainman by his Local Chairperson, to the officer of the Company authorized to receive same within sixty (60) days from the date of occurrence on which the claim or grievance is based." *Id*. at 5. Pursuant to Article 29, "[n]o trainman shall be disciplined without a fair hearing (investigation) by an officer" of Illinois Central, and "[d]iscipline, if any, must be assessed within fifteen (15) days of [an] investigation." *Id*. at 6.

Article 29, Section D provides that "should any Trainman … consider that he has been unjustly dealt with, he shall have the right of appeal as provided in Article 28." *Ibid*. The General Committee of Adjustment, which as noted above is the mid-level union body responsible for negotiating and policing the CBA, Doc. 72 at ¶ 4, handles such appeals on behalf of UTU members, *id*. at ¶ 10. Ordinarily, the local chairperson forwards the transcript of the Illinois Central investigation and any other relevant material to the General Committee of Adjustment chairperson. *Ibid*. The general chairperson must file an appeal with Illinois Central within 180 days from the assessment of discipline. Doc. 58-4 at 5; Doc. 72 at ¶ 10. Accordingly, given the August 3, 2010 termination date, to challenge Pisut's termination pursuant to the CBA, an appeal had to have been filed—and notice of UTU's intent to appeal had to have been given to Illinois Central—by January 30, 2011.

On or about the day that he was terminated, Pisut called Hardlannert to inform him of the termination. Doc. 72 at ¶ 25. Hardlannert told Pisut that he would appeal the termination. *Ibid*.

4

Illinois Central contacted DeKeyser, asking where the transcripts and exhibits relating to Pisut's case should be sent. *Id*. at ¶ 26. DeKeyser then contacted Hardlannert, who indicated that the transcripts should be sent to him. *Ibid*. Illinois Central then sent all materials relating to Pisut's termination directly to Hardlannert. *Ibid*. DeKeyser informed Pisut that the next step would be to appeal the termination, but never told Pisut that *he* would file the appeal. *Ibid*. (Pisut's assertion that "DeKeyser may not have indicated that he directly would file the appeal," *ibid*., is not supported by any record citation and therefore is disregarded.)

Six days later, on August 9, 2010, Pisut filed a claim for benefits with the UTU Discipline Income Protection Program ("D/IPP"). *Id*. at ¶ 27. Hardlannert certified that Pisut was eligible for benefits, thereby "purportedly verifying that the case was under appeal." *Ibid*. DeKeyser wrote on the D/IPP forms that Pisut's case had been referred to the General Committee of Adjustment chairperson, Richard "Red" Dare, for handling, which was DeKeyser's understanding. *Ibid*. DeKeyser assumed that that Hardlannert had forwarded the required appeal materials to Dare, and DeKeyser did not know that an appeal had not been filed when he completed the D/IPP claim forms. *Ibid*. Pisut was paid $100 in D/IPP benefits per day for 250 days, the maximum allowed under the program. *Ibid*.

Fifteen months later, on or about December 10, 2011, Pisut called Dare to check the status of his appeal. *Id*. at ¶ 28. Dare told Pisut that he did not have any information regarding the appeal, and Pisut did not ask why Dare had no such information or confirm that Dare had received the appeal in the first place. *Ibid*. In 2011 and 2012, Pisut called Dare several times to check the status of the appeal and to ask for the date of the arbitration hearing, and on each call, Dare told Pisut that he did not have any information regarding the appeal. *Id*. at ¶ 30. In or around May 2013, Pisut's counsel contacted Dare and, following the conversation, reported to

5

Pisut that he did not think that Dare had filed an appeal. *Id*. at ¶ 31. On or about May 13, 2013, Pisut contacted Dare, and Dare confirmed that no appeal had been filed. *Ibid*. Pisut filed this suit less than five months later, on September 24, 2013. *Id*. at ¶ 33.

On June 15, 2013, about a month after Dare confirmed to Pisut that no appeal had been filed, Pisut signed a settlement agreement with Illinois Central. Doc. 70-1 at 196; Doc. 72 at ¶ 32; Doc. 73 at ¶ 3. The agreement released "Illinois Central Railroad Company, its parents, subsidiaries, successors, assigns and affiliates now existing or hereafter created and acquired, including, but not limited to, all corporations wholly or primarily owned or controlled by Canadian national railway, directly or indirectly, and each of their agents, servants, employees, directors, officers, insurers and stockholders" from several potential claims, including those "under the … Railway Labor Act." Doc. 70-1 at 196, 198; Doc. 73 at ¶ 3. UTU was not a party to the settlement agreement. *Ibid*.

## Discussion

The RLA empowers the members of a given craft or class of employees to determine, by majority vote, who shall represent them under the RLA; whomever they choose, typically a labor union, then acts as the employees' exclusive representative in bargaining with the employer under the RLA. *See* 45 U.S.C. § 152, Second, Fourth, Sixth, Seventh; *Steele v. Louisville Nashville R.R. Co.*, 323 U.S. 192, 199-200 (1944). The RLA provides that "[e]mployees … have the right to organize and bargain collectively through representatives of their own choosing." 45 U.S.C. § 152, Fourth. "The RLA was enacted to encourage collective bargaining by … parties in order to prevent, if possible, wasteful strikes and interruptions of interstate commerce." *Air Line Pilots Ass'n, Int'l v. United Air Lines, Inc.*, 802 F.2d 886, 895 (7th Cir. 1986) (quoting *Detroit & Toledo Shore Line R.R. v. United Transp. Union*, 396 U.S. 142, 148 (1969)) (internal quotation

6

marks omitted). The RLA requires unions to represent union members fairly. *See Steele*, 323 U.S. at 202-03 (holding that the RLA "impose[s] on the bargaining representative of a craft or class of employees the duty to exercise fairly the power conferred upon it in behalf of all those for whom it acts"). The RLA thus "affords an employee an implied right of action against his union for breach of the duty of fair representation." *Steffens v. Bhd. of Ry., Airline & S.S. Clerks*, 797 F.2d 442, 445 (7th Cir. 1986).

I.  **UTU's Summary Judgment Motion**

UTU offers five grounds for summary judgment on Pisut's duty of fair representation ("DFR") claim, which will be addressed in turn.

*First*, UTU asserts that because it is an international umbrella organization, it may not be held vicariously liable for the actions or inactions of the local and the General Committee of Adjustment, its subordinate bodies. Doc. 63 at 6-7. In support, UTU cites *Cleveland v. Porca Co*, 38 F.3d 289 (7th Cir. 1994), for the proposition that an international "cannot be held liable for actions of a subordinate body [in a DFR suit] without evidence tying the [i]nternational [union] to the disputed events." Doc. 63 at 6. *Porca* held that under the circumstances of that case, the international's connection with the underlying events was too loose to support liability, and it is true that in *Porca*, as here, the international union did not negotiate the applicable CBA. 38 F.3d at 292.

Yet it also is true that a "union's statutory duty of fair representation is coextensive with its authority … to act as the exclusive representative for the members of the collective bargaining unit." *Freeman v. Local Union No. 135*, 746 F.2d 1316, 1320-21 (7th Cir. 1984). *Porca* does not indicate whether the CBA there designated the local or the international as the bargaining unit's exclusive representative. Here, the parties agree that "UTU is the certified representative

7

of employees employed by [Illinois Central]" in Pisut's class. Doc. 72 at ¶ 3. The CBA itself states that the "United Transportation Union shall have the exclusive right to represent all Trainmen in company level grievance, claim and disciplinary proceedings." Doc. 58-4 at 4. UTU does not argue, and the summary judgment record does not demonstrate, that by "United Transportation Union," the CBA meant the local or the General Committee of Adjustment as opposed to the International. It follows that, on this record, a reasonable jury could find that UTU (the International) had the exclusive right to represent members of Pisut's bargaining unit, and therefore that UTU owed Pisut a DFR with respect to the appeal of his termination.

UTU retorts that the General Committee of Adjustment is the body to which the DFR is imputed. Doc. 79 at 3. In support, UTU cites another portion of the CBA, which identifies the union members' "duly accredited representative" as "the regularly constituted General Committee and/or the Officers of the United Transportation Union of which such General Committee or Officers are a part." Doc. 61-8 at 6; Doc. 87 at 3. If the quoted passage stopped after the first "General Committee," UTU might have had a good point. But the passage goes on to say "and/or the Officers of the United Transportation Union of which such General Committee or Officers are a part," which reasonably could be read to identify the International as the duly accredited representative, for the General Committee of Adjustment is a "part" of the International. UTU gives no reason why the passage should *not* be read that way.

*Second*, UTU contends that Pisut's settlement agreement with Illinois Central released *all* of his RLA claims—not just those against Illinois Central, but also those against UTU. Doc. 63 at 7-9. The contention is absurd. By its express terms, the settlement agreement released Pisut's claims only against Illinois Central, not against UTU, and UTU does not suggest, let alone demonstrate, that it is a third-party beneficiary of the agreement. Doc. 70-1 at 196, 198 ("Illinois

8

Central Railroad Company, its parents, subsidiaries, successors, assigns and affiliates now existing or hereafter created and acquired, including, but not limited to, all corporations wholly or primarily owned or controlled by Canadian national railway, directly or indirectly, and each of their agents, servants, employees, directors, officers, insurers and stockholders" from several potential claims "under the … Railway Labor Act"); *compare Thompson v. United Transp. Union*, 2000 WL 1929963, at *3 (D. Kan. Dec. 19, 2000) (holding that the plaintiff's settlement agreement with her employer, which released "any and all persons" from all claims "arising out of her employment," covered her union as well as the employer). UTU instead points to the section of the agreement where Pisut releases:

> Any and all claims and/or grievances, including alleged breach of contract (express or implied) related to or concerning any matters pertaining to Employee's employment, including any arising under the labor agreement between the United Transportation Workers Union ("UTU") and IC. To the extent any such claims are currently pending, Pisut agrees to instruct the UTU to withdraw and dismiss such claims with prejudice, and provide IC notice of same.

Doc. 70-1 at 198. But this quite clearly refers to claims that UTU pursues on Pisut's behalf against Illinois Central, not claims that Pisut has against UTU.

UTU also contends that because the settlement agreement extinguished Pisut's claim against UTU, there is no longer any disciplinary action to appeal, and if there is no longer anything to appeal, then UTU cannot be held liable for breaching its DFR in connection with the appeal. But UTU forgets that Pisut's DFR claim is seeking (among other things) damages reflecting the difference between what he *would have* received from Illinois Central had his appeal not been bungled and what, in his weakened negotiating position after the appeal deadline had long since passed, he actually did receive from Illinois Central. The settlement agreement certainly does not extinguish that claim.

9

*Third*, UTU argues that Pisut failed to exhaust the applicable grievance arbitration procedures before bringing this suit. Doc. 63 at 9-10. In support, UTU cites *Frandsen v. Brotherhood of Railway, Airline, and Steamship Clerks*, 782 F.2d 674 (7th Cir. 1986), for the proposition that, prior to filing suit, a "union member clearly must exhaust [administrative remedies] unless an intra-union appeal is demonstrably futile." *Id*. at 680. This argument misreads *Frandsen* and the RLA scheme as a whole.

A federal court in an RLA suit must determine whether the dispute is major or minor. *See Consolidated Rail Corp. v. Ry. Lab. Execs.' Ass'n* ("*Conrail*"), 491 U.S. 299, 318-19 (1989); *Bhd. of Maint. of Way Emps. v. Atchison, Topeka & Santa Fe Ry. Co.*, 138 F.3d 635, 638 (7th Cir. 1997) ("Congress charged the federal courts with a seminal but limited role under this regime—that of taxonomist. Courts are to sort labor disputes into two piles, major or minor."). If the court classifies the dispute as minor, then the dispute "is subject to compulsory and binding arbitration … before an adjustment board [under the RLA]," *Conrail*, 491 U.S. at 303, and the adjustment board's jurisdiction to resolve the dispute is "exclusive." *Bhd. of Maint. of Way Emps. v. Union Pac. R.R. Co.*, 358 F.3d 453, 456 (7th Cir. 2004) ("The RLA grants exclusive jurisdiction to resolve 'minor' disputes regarding railway labor agreements to arbitrators on the National Railroad Adjustment Board or adjustment boards established by an employer and a union."). *Frandsen*, however, holds that "[a] fair representation claim, regardless of its factual context, is by definition a 'non-minor' dispute since it involves the implied *statutory* relationship between a union and those it represents rather than the actual *contractual* relationship over which the [National Railway Arbitration Board] has jurisdiction." 782 F.2d at 685. Pisut's DFR claim accordingly is non-minor, meaning that he had no exhaustion obligation before filing this suit. *See ibid*. ("the courts will take jurisdiction over non-minor disputes between employees and their

railroad employers without exhaustion of Adjustment Board remedies") (citing *Glover v. St. Louis-S.F. R.R. Co.*, 393 U.S. 324, 330 (1969)).

*Fourth*, UTU argues that Pisut's DFR claim is barred by the six-month statute of limitations. Doc. 63 at 10-12; *see DelCostello v. Int'l Bhd. of Teamsters,* 462 U.S. 151, 170-72 (1983). The limitations period runs not from the time of the injury itself, but instead from when the plaintiff "discovers, or in the exercise of reasonable diligence should have the discovered, the acts constituting the alleged [violation]." *Christiansen v. APV Crepaco, Inc.*, 178 F.3d 910, 914 (7th Cir. 1999) (internal quotation marks omitted). Because the standard is one of reasonable, not actual, notice, "the fact that [UTU] did not directly notify [Pisut] that it failed to file" an appeal for him "is not itself a bar to accrual." *Christiansen*, 178 F.3d at 915. Moreover, "[p]rolonged inaction [by the union] is sufficient to give a diligent plaintiff notice that the union has breached its duty of fair representation." *Pantoja v. Holland Motor Express, Inc.*, 965 F.2d 323, 327 (7th Cir. 1992).

As noted, the deadline for UTU to submit an appeal to Illinois Central was January 30, 2011. UTU contends that the summary judgment record demonstrates that Pisut could or should have known at any of the following junctures that UTU had not filed an appeal: (1) during the 10½ months between the filing deadline and December 10, 2011, when Pisut was not in contact with Dare; (2) on December 10, 2011, when Pisut first called Dare to ask about the appeal and was told that Dare had no information; and (3) on several undefined dates in 2011 and 2012, when Dare again told Pisut that he had no information about the appeal. Doc. 63 at 11-12; Doc. 87 at 10-11. Pisut responds that he did not have and could not reasonably have had notice of UTU's failure to appeal until May 13, 2013, when Dare finally admitted that UTU had not

appealed. Doc. 68 at 14. Because Pisut filed this suit on September 24, 2013, less than six months later, the suit is timely on his reading of the record and untimely on UTU's reading.

Viewing the facts as favorably to Pisut as the record reasonably allows, the jury could conclude that his not discovering prior to May 13, 2013 the failure to appeal was reasonable. *See Killian v. Concert Health Plan*, 742 F.3d 651, 666-67 (7th Cir. 2013) (en banc) (holding that "a reasonable trier of fact could conclude" that an insurance company's official representative should have known from the context of a telephone conversation which information the caller was seeking, that the caller's reliance on the representative's ambiguous statement was not unreasonable, and that a caller need not "ask precisely the right questions" to be entitled to that reliance) (internal quotation marks omitted). By neither Pisut's nor UTU's account did Dare actually tell Pisut in 2011 or 2012 that no appeal had been filed. Doc. 76 at ¶¶ 25, 27. Dare's telling Pisut that he had no information regarding his appeal could very well have been taken as a signal that no appeal had been filed, but a reasonable jury also could find that it was reasonable for Pisut to conclude that Dare was merely indicating that he had no information about an appeal that had actually been filed. After all, if no appeal had been filed, the most natural response to Pisut's inquires would have been, "What appeal?"

Moreover, upon Pisut's claim for D/IPP benefits, DeKeyser and Hardlannert conveyed that his matter had been referred to Dare and was on appeal, and Pisut then received the maximum allowable D/IPP benefits for 250 days. Doc. 72 at ¶ 27. A reasonable jury could find that it was not unreasonable for Pisut to assume that because UTU was paying him as a result the incident that led to his termination, UTU was pursuing the appeal. Thus, while the Seventh Circuit held in *Dozier v. Trans World Airlines, Inc.*, 760 F.2d 849 (7th Cir. 1985), that repeated requests to a union are not sufficient to extend a statute of limitations, it did so where "the Union

informed plaintiff in no uncertain terms that" it was not pursuing his grievance and then reiterated that "clear sentiment … in every future communication received by the plaintiff." *Id*. at 852; *see also Smith v. United Airlines, Inc.*, 2014 WL 4181978, at *3 (N.D. Cal. Aug. 22, 2014) (holding that the plaintiffs were on notice that the union was not pursuing their grievances where "all of Plaintiffs' allegations indicated that the Union was not processing [their] grievances"). Nothing close to that happened here.

*Fifth*, UTU contends that Pisut's DFR claim fails on the merits. Doc. 63 at 12-15. "A union breaches its duty of fair representation only where its actions in pursuing a member's grievance are arbitrary, discriminatory, or in bad faith." *Truhlar v. U.S. Postal Serv.*, 600 F.3d 888, 892 (7th Cir. 2010) (quoting *Air Line Pilots Ass'n, Int'l v. O'Neill*, 499 U.S. 65, 67 (1991)) (internal quotation marks omitted). Invoking the arbitrariness prong, Pisut argues that UTU had no "rational basis of explanation" for failing to appeal. Doc. 60-1 at 8-9.

"[A] union's actions are arbitrary only if, in light of the factual and legal landscape at the time of the union's actions, the union's behavior is so far outside a wide range of reasonableness as to be irrational." *O'Neill*, 499 U.S. at 67 (internal quotation marks omitted). Although "mere negligence, even in the enforcement of a collective-bargaining agreement, would not state a claim for breach of the duty of fair representation," *Neal v. Newspaper Holdings, Inc.*, 349 F.3d 363, 369 (7th Cir. 2003) (quoting *United Steelworkers of Am. v. Rawson,* 495 U.S. 362, 372-73 (1990)), "a union may not arbitrarily ignore a meritorious grievance or process it in a perfunctory fashion," *Yeftich v. Navistar, Inc.*, 722 F.3d 911, 917 (7th Cir. 2013) (quoting *Vaca v. Sipes*, 386 U.S. 171, 191 (1967)). When deciding whether and how to proceed on behalf of a member, the union may "act in consideration of such factors as the wise allocation of its own resources, its relationship with other employees, and its relationship with the employer." *Ibid*. (internal

13

quotation marks omitted). At root, "the thoroughness of [the union's efforts] depends on the particular case, and only an egregious disregard for the union members' rights constitutes a breach of the union's duty." *Ibid*. (internal quotation marks omitted). "Whether a union's actions are arbitrary calls for an objective inquiry." *Ibid*. (quoting *Neal*, 349 F.3d at 369).

Here, viewing the record in the light most favorable to Pisut, UTU failed without explanation to pursue Pisut's appeal. UTU observes that Hardlannert acted as Pisut's agent in the appeals process, but Hardlannert did so only after receiving DeKeyser's blessing. During the D/IPP process, DeKeyser and Hardlannert indicated to Pisut that his case was on appeal. *Id*. at ¶ 27. This suggests that UTU regarded the case as a normal appeal, and UTU has no explanation for why this appeal was handled differently than the others where UTU actually followed through. On this record, a reasonable jury could find that UTU's failure to appeal constituted an "egregious disregard" for Pisut's rights. *Yeftich*, 723 F.3d at 917 (internal quotation marks omitted).

In addition to showing that UTU acted arbitrarily, Pisut must show that he "was actually harmed by the union's actions," meaning that he "must … establish that the outcome of the arbitration would probably have been different but for the union's activities." *Garcia v. Zenith Elecs. Corp.*, 58 F.3d 1171, 1176-77 (7th Cir. 1995). UTU contends that Pisut "presents no evidence that had his case been appealed and taken to arbitration that an arbitrator would have overturned [Illinois Central's] decision to discharge him." Doc. 63 at 15. In support, UTU points to Pisut's disciplinary record, his admission of fault in the April 2010 incident, and Dare's testimony that in his professional opinion a reversal of Pisut's termination was unlikely. *Ibid*. Pisut responds, with record support, that he was not at fault for the April 2010 incident, that he was treated more harshly than other workers involved in the incident, and that the track record of

employees with similar disciplinary records suggests that he would have been reinstated. Doc. 61 at ¶ 28; Doc. 73 at ¶ 6; Doc. 75 at 10-11. On this record, the court cannot conclude that no reasonable jury could find that Pisut's appeal would have prevailed had UTU filed it. *See Garcia*, 58 F.3d at 1180 (favorably citing *Seymour v. Olin Corp.*, 666 F.2d 202, 208 (5th Cir. Unit B 1982), which held that "the union's actions clearly caused harm to the employee" given that "the union did not pursue [the employee's] grievance at all").

## II.  Pisut's Summary Judgment Motion

Although Pisut succeeds in forestalling summary judgment *against* him with the record viewed in the light most favorable to him, he cannot *obtain* summary judgment on that record when it is viewed in the light most favorable to UTU. A reasonable jury certainly could find, among other things, that Pisut, in the exercise of reasonable diligence, would have determined more than six months before filing suit that UTU had failed to appeal his termination, and also that UTU's inaction did not harm him because he would have lost his appeal anyway. Because either of these findings would defeat his DFR claim, Pisut is not entitled to summary judgment.

## Conclusion

For the foregoing reasons, Pisut's and UTU's summary judgment motions are denied. This case will proceed to trial.

September 29, 2015

United States District Judge

15